IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (603) 581-5458 THAT IS IN THE CUSTODY OR CONTROL OF CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS | Case No. 1:21-mj- 265-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Robert Lukacz, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned with call number (603) 581-5458 ("Target Telephone #2 or TT2), a prepaid Tracfone, activated on July 19, 2021, with no listed subscriber information that is in the custody or control of Cellco Partnership DBA Verizon Wireless (Verizon), a wireless communications service provider who accepts service of process at National Compliance Center at 180 Washington Valley Road, Bedminster, NJ 07921. As a provider of wireless communications service, Verizon is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require Verizon to disclose to the government the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3. Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. See 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. See 18 U.S.C. § 3123(b)(1).

4. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Task Force Officer ("TFO") with the United States Drug Enforcement Administration ("DEA") and have been so employed since September 2017.

5. I have been a full-time Police Officer since December 1998. From December 1998 to June 2002, I was employed as a police officer by the City of Portsmouth, New Hampshire. From June 2002 to July 2003, I was employed as a police officer by the Montgomery County, Maryland Police Department. In 2003, I returned to New Hampshire. I have been employed as a police officer by the City of Portsmouth, New Hampshire, from July 2003 to the present. Since September 2017, I have been assigned as a TFO with DEA's Portsmouth District Office Tactical Diversion Squad (TDS), where my primary duties are to investigate the distribution of controlled substances including oxycodone, methamphetamine, heroin, fentanyl, and other substances in violation of state and federal drug laws, including Title 21, United States Code, Sections 841 and 846.

6. As a DEA TFO, I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover

agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I am familiar with the benefits and limitations of these techniques. I have also reviewed recorded conversations and telephone, financial, and drug records. I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity to protect their operations, members, narcotics, and narcotics proceeds.

7. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. Specifically, I am familiar with the way narcotics traffickers use vehicles, the mail and private delivery services as well as a variety of other means to transport and distribute narcotics and proceeds of narcotics trafficking. Further, I know that individuals who distribute narcotics often utilize cellular telephones, and the text messaging capability included within their cellular telephones, as a method by which to arrange narcotics transactions. I also know that individuals involved in the distribution of controlled substances frequently talk in code, either during conversations or while utilizing the text messaging function within their cellular telephone, as a means to avoid detection and apprehension by law enforcement. In addition, through investigations and training, I know that drug traffickers may: (a) not maintain cellular telephones for significant periods of time; (b) obtain cellular telephones with false identification information; and/or (c) obtain cellular telephones which do not require the purchaser to disclose personal identification information during the transaction. Such methods are utilized in order for those involved in illicit drug activity to avoid discovery by law enforcement.

8. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 21 U.S.C. § 843(b) (use of a communication facility in the commission of controlled substances trafficking offenses), 21 U.S.C. § 846 (conspiracy to distribute and to possess with intent to distribute a controlled substance), and 18 U.S.C. § 1073 (flight to avoid prosecution) (the "target offenses") have been committed, are being committed, and/or will be committed by David C. HALL (DOB          ) ("HALL").  There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

9. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is the District of New Hampshire, a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

10. The United States, including the United States Drug Enforcement Administration ("DEA"), is conducting a criminal investigation of HALL regarding possible violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 21 U.S.C. § 843(b) (use of a communication facility in the commission of controlled substances trafficking offenses), 21 U.S.C. § 846 (conspiracy to distribute and to possess with intent to distribute a controlled substance) and 18 U.S.C. § 1073 (flight to avoid prosecution) (the "target offenses").

11. On June 19, 2021, Portsmouth, NH Police Department Police Officer Keagan Pearl attempted to stop a vehicle for an illegal U-turn and failing to use a turn signal. The vehicle

was NH 484 9356, a green Volvo 80, registered to Dwight DEVORK of Wolfeboro, New Hampshire. The vehicle was being driven by a lone male, later identified as David C. HALL.

12. When Officer Pearl activated his fully marked Police cruiser's emergency lights, HALL did not stop. HALL drove the Volvo onto the Pease New Hampshire Air National Guard Base in Newington, NH. Once on the base, HALL stopped the Volvo and ran away from it. HALL was not located that evening and has not been found since. In plain view inside the abandoned car, Officer Pearl located a clear plastic baggy containing an off-white powdery substance believed to be fentanyl. This baggy and contents weighed approximately 52 grams. At this time, we are awaiting lab results on the suspected narcotics.

13. Also found inside the Volvo was a black Samsung Galaxy cell phone. The cell phone was mounted to the interior windshield and had the GPS open with active directions to 31 Elm Street, Wolfeboro, NH. Based on exigent circumstances, Officer Pearl opened the Facebook app installed on the phone in an effort to identify the male driver. The Facebook profile came back to HALL's. The profile picture was HALL matched the description of the male driving the Volvo.

14. The Volvo was seized and towed to the Portsmouth, NH Police Department. A search warrant was applied for and granted for Officers/Detectives to search the Volvo. On June 23, 2021, the search warrant was executed on the Volvo. During the search, small amounts of marijuana, a digital scale, drug paraphernalia and approximately 79 Suboxone strips were located in the Volvo. The suboxone strips were all prescribed in HALL's name.

15. At the time of the pursuit on June 19, HALL was on Federal Supervised Release in the District of New Hampshire. HALL's federal supervision stemmed from an original

conviction and sentence for the offenses of Robberies Involving Controlled Substances, and Possession with Intent to Distribute a Controlled Substance (Case Number 11-CR-39-01-SM).

16. On or about June 23, 2021, U.S. Probation Officer Davidson filed a Petition for Warrant or Summons for Offender Under Supervision in the District of New Hampshire. The petition outlined the nature of HALL's noncompliance with respect to HALL's June 19 incident involving the Portsmouth Police Department. On June 23, 2021, an arrest warrant was issued for HALL in the U.S. District Court, District of New Hampshire for the offense of Violations of Conditions of Supervised Release. The federal arrest warrant was assigned to Deputy United States Marshal (DUSM) Murano.

17. Deputy U.S. Marshal (DUSM) Murano obtained a last known phone number for HALL, 603-581-6647 (Target Telephone 1 or TT1), from HALL's Supervising Probation Officer and a U.S. Probation Offender/Defendant Information Sheet. The USMS further established 603-581-6647 as HALL's last known phone number through interviews of HALL's sister, Julia HALL and HALL's girlfriend (interviewed in July 2021). HALL's Supervising Probation Officer, Officer DAVIDSON reported that he exchanged text messages with HALL on HALL's telephone 603-581-6447 on May 11, 2021, May 19, 2021, and June 14, 2021.

18. On July 6, 2021, the United State Marshals Service (USMS) received subscriber information and call records pursuant to an administrative subpoena from Verizon Wireless on HALL's telephone, 603-581-6447.

19. Analysis of call records indicate TT1 was in frequent contact with HALL's known associates and family members, including HALL's girlfriend, Aja DEVORK, HALL's sister, Julia HALL, and HALL's known associates, Michael LOPES and Bradley SMART. During the USMS fugitive investigation, the USMS interviewed Aja DEVORK, Julia HALL,

CIs and viewed publicly available social media information and were able to substantiate the relationship of these individuals to HALL as well as obtain associated phone numbers for call record analysis.

20. The last outbound call from TT1 was made on June 19, 2021, the same day as the incident in which HALL eluded the Portsmouth Police. As previously stated, Portsmouth Police recovered a cell phone from the vehicle HALL was operating prior to fleeing police on foot.

21. In August 2021, pursuant to administrative subpoena, the USMS received subscriber information and telephone call records for several phones belonging to individuals HALL maintained frequent contact with utilizing TT1. Analysis of these records indicated a new telephone (603-581-5458, TT2) began to communicate with Hall's girlfriend, DEVORK, in July 2021.

22. On September 21, 2021, the USMS received subscriber info and call records pursuant to administrative subpoena from Verizon Wireless for telephone 603-581-5458 (Target Telephone 2 or TT2). Analysis of call records shows that TT2 and TT1 had five commonly called numbers between them. For example, TT1 communicated with HALL's girlfriend, DEVORK, (telephone 603-393-8616) 1,583 times between May 2, 2021, and June 20, 2021, and TT2 communicated with DEVORK 4,107 times between July 19, 2021, and September 1, 2021). TT1 communicated with HALL's associate, LOPES (telephone number 603-832-8265), 448 times between May 3, 2021, and June 20, 2021, and TT2 communicated with LOPES 43 times between August 2, 2021 and September 11, 2021. TT1 Communicated with HALL's associate, SMART (telephone number 603-273-1950), 25 times between May 9, 2021 to June 19, 2021, and TT2 communicated with SMART 51 times between July 30, 2021 and August 20, 2021.

23. In July 2021, the USMS developed information through a Confidential Informant (CI) indicating that HALL may have traveled to California with plans to enter Mexico. HALL was born in California, and the USMS developed information indicating that HALL's biological father resided in California.

24. The USMS developed information through a pawn transaction indicating that on August 23, 2021, HALL sold a Galaxy cell phone, in person, at an automated kiosk at Kroger-Ralphs, located at 101 G St, San Diego, CA 92101. Evidence of HALL's transaction at this Kiosk was obtained by the USMS, and includes, an image of the scanned NH Identification card belonging to HALL, a photograph of HALL's face, and the name David Carlton HALL (DOB           ) listed as the customer's name. HALL is presumed to still be in California.

25. Is it believed that no matter where HALL is located, he will continue his drug trafficking activities. HALL is a wanted fugitive, and has easily identifiable tattoos, to include, on his chin, neck, and both sides of his head, thus HALL has no likelihood of obtaining a legitimate job and will likely continue to engage in criminal activity in order to support himself.

26. This belief is consistent with HALL's lengthy criminal history which includes the following convictions:

**05/15/2002** – Simple Assault – Ossipee (NH) District Court, Dkt.# 02-CR-948

**10/08/2002** – Burglary (2 counts) – 6th Judicial Circuit Court of Florida- Pinellas County Dkt.# CR02-14099CFANO

**05/14/2003** – Possession of Controlled Drugs (Marijuana) – Rochester (NH) District Court, Dkt.# 03-CR-00325

**05/27/2003** – Burglary – Carroll County (NH) Superior Court, Dkt.# 02-S-333

**06/27/2008** – Issuing Bad Check – Ossipee (NH) District Court, Dkt.# 08-CR-0854

**11/04/2009** – Burglary – Carroll County (NH) Superior Court, Dkt.# 09-S-010

**11/19/2009** – Criminal Trespassing, Criminal Mischief, Possession of a Controlled Drug (Marijuana), Dkt.# 09-CR-2783, 2479, and 2480

**11/10/2011** – Robberies Involving Controlled Substances, and Possession with Intent to Distribute a Controlled Substance, United States District Court, District of New Hampshire. Sentencing Judicial Officer, Honorable Steven J. McAuliffe, 11-CR-39-01-SM.  Revocation 11/05/2019.

27. As evidenced above, HALL's prior convictions for crimes of violence make him a career offender.  Additionally, HALL was noted by U.S. Probation to have strong gang affiliations, namely to the Aryan Resistance Militia and BOWW.

28. In my training and experience, I have learned that Verizon is a company that provides cellular communications service to the general public.  I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate general location of the cellular device.

29.     Based on my training and experience, I know that Verizon can collect cell-site data on a prospective basis about the Target Phone #2.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.   I also know that wireless providers such as Verizon typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

30.     Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT").  RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

31.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").  The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can

be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

33. Based on my training and experience, I know that wireless providers such as Verizon typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as Verizon typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Phone #2's user or users and may assist in the identification of co-conspirators.

**AUTHORIZATION REQUEST**

33. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A for each communication to or from the Target Telephone #2, without geographic limit, for a period of forty-five days (45) days pursuant to 18 U.S.C. § 3123(c)(1).

34. I further request that the Court direct Verizon to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or

control. Because the warrant will be served on Verizon who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

/s/ Robert Lukacz
Special Agent Robert Lukacz
Drug Enforcement Administration

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: 10/4/2021
Time: 4:17 PM

/s/ Andrea Johnstone
Hon. Andrea Johnstone
United States Magistrate Judge

## ATTACHMENT A

Information about the location of the mobile phone assigned (603) 581-5458 ("Target Phone #2"), whose service provider is Verizon Wireless, a company that accepts process at 180 Washington Valley Road, Bedminster, New Jersey 07921, and stored at premises controlled by Verizon Wireless ("Verizon Wireless" or the "Provider"), headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

# ATTACHMENT B

I. <u>Prospective information about the location of the Target Telephone #2 described in Attachment A for a period of 30 days, during all times of day and night, including:</u>

1. E-911 Phase II data;

2. GPS data;

3. latitude-longitude data;

4. other precise location information; and

5. pen register / trap and trace device with prospective cell site information and all related data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Telephone #2 during any voice, SMS, and/or data transmission.

This warrant does not authorize the collection of any content of any communications.

To the extent necessary to provide the authorized location information about the target device, this warrant also authorizes the installation of a pen register and trap and trace device on the Target Telephone #2.

Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Information about the location of the Target Phone unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the Target Phone on Verizon Wireless's network, and at such intervals and times directed by the government. The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

Verizon Wireless shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon

notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b). *See* 18 U.S.C. § 2705(b). Verizon Wireless may disclose this Order to an attorney for Verizon Wireless for the purpose of receiving legal advice.

II. <u>All information about the location of the Target Telephone #2, described in Attachment A, for a period of thirty days prior to the date of this Order, during all times of day and night, including</u>:

  1. subscriber, local and long distance telephone connection records with cell site information, call detail and billing records, including means and source of payment for Target Phone and any other cellular telephones billed to the same account as Target Phone, for a period of thirty (30) days prior to the date of this Order.

## Information to be Seized by the Government

All information that constitutes evidence of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 21 U.S.C. § 843(b) (use of a communication facility in the commission of controlled substances trafficking offenses), 21 U.S.C. § 846 (conspiracy to distribute and to possess with intent to distribute a controlled substance) and 18 U.S.C. § 1073 (flight to avoid prosecution) (the "target offenses").

# CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by [**PROVIDER**], and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of [**PROVIDER**].  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Verizon, and they were made by Verizon as a regular practice; and

    b.    such records were generated by Verizon's electronic process or system that produces an accurate result, to wit:

        1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Verizon in a manner to ensure that they are true duplicates of the original records; and

        2.    the process or system is regularly verified by Verizon, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____  _____
Date                          Signature